Filed 2/28/14  P. v. Adams CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JOYCE ADAMS,<br><br>　　　Defendant and Appellant. | A134308<br><br>(Lake County<br>　Super. Ct. No. CR927390) |
| In re JOYCE ADAMS,<br><br>　　　on Habeas Corpus. | A139103 |

　　　This is an appeal from final judgment after a jury convicted defendant Joyce Adams of two counts of possession for sale of methamphetamine, one count of possession for sale of marijuana and one count of possession of a controlled substance, and the trial court found true that defendant had two prior convictions pursuant to Health and Safety Code section 11370.2 and was on bail when she committed the second count of possession for sale of methamphetamine.[1]  Defendant challenges this judgment on direct appeal and by petition of habeas corpus, which we consider collectively.  For reasons set forth below, we affirm and summarily dismiss the habeas corpus petition.

---

[1]　　　Unless otherwise stated, all statutory citations herein are to the Penal Code.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

In October 2011, an information was filed charging defendant with two felony counts of possession for sale of methamphetamine, the first on July 15, 2011 (count one) and the second on August 19, 2011 (count four) (Health & Saf. Code, § 11378); one felony count of possession of controlled substances for sale on July 15, 2011 (Health & Saf. Code, § 11351); and one felony count of possession of marijuana for sale on July 15, 2011 (Health & Saf. Code, § 11359).[2] It was further alleged that, as to counts one, two and four, defendant had suffered prior convictions pursuant to Health & Safety Code section 11370.2, and that, as to count four, she committed the offense while released on bail pursuant to former section 12022.1.

These charges stemmed from two separate arrests at defendant's Clear Lake residence, which consisted of a "single wide" mobile home with an enclosed porch entered through a steel security door outside a regular door. The first arrest occurred on July 15, 2011, when Lake County Sheriff's Detective Lucas Bingham entered defendant's residence through the porch pursuant to a search warrant. Defendant did not answer the door when Detective Bingham knocked, but was present inside after a deputy sheriff forced open the door. Detective Bingham first went to an area with a computer desk, which stood to the right of a small wooden dresser. In a dresser drawer he found a working digital scale with a residue resembling methamphetamine, a black plastic tray with a substance resembling methamphetamine, a clear plastic bag with a similar substance, ten prescription pill bottles, several bags of marijuana and numerous small Ziploc bags. Each of the ten pill bottles contained pills and, collectively, they contained 120 morphine pills and 29 hydrocodone pills. In addition, one bottle was labeled "oxycodone" with the name "Charlene McCracken," and contained 56 oxycodone pills. Another bottle was partially labeled "morphine."

Detective Bingham also found the following items in the residence: a post-it note with notations identifying marijuana types and prices, 85 individual baggies containing

---

[2]     The First Amended Consolidated Information, Nos. CR 927390 and CR 926945, was filed on October 31, 2011.

2

marijuana, $942 in cash (mostly in $20 bills), 20.7 grams of methamphetamines (approximately $2,000 street value)[3], about 3.4 pounds of marijuana (anywhere from $1,200 to $4,000 street value, depending on quality), and a monitor showing video from a camera aimed at the driveway. Based on the results of this search, Detective Bingham arrested defendant after reading her *Miranda* rights.

On August 19, 2011, Detective Bingham returned to defendant's residence with a search warrant. Defendant was again present, and did not appear under the influence of drugs. During the search that ensued, Detective Bingham found a flat polished rock on the computer console with a "white crystalline substance" on top. Officers also found an additional quantity of methamphetamine in a small bag in the dresser (for a total of two grams inside the residence), as well as two scales (one covered in a residue resembling methamphetamine), more Ziploc bags (some unused and others holding jewelry-type beads), a glass pipe suitable for smoking methamphetamine, and United States currency.

Outside, Detective Bingham found a bag containing approximately four more grams of methamphetamine. He found this bag in an area near a bush where a sergeant had taken defendant when they began the search. About ten minutes earlier, Detective Bingham had heard the sergeant ask defendant what she had in her hands and saw her turn away before showing her hands, prompting him to later search the area.

Detective Bingham thus arrested defendant a second time for possession of methamphetamine for sale, this time while still on bail for the July 2011 charges.

Trial began November 16, 2011. Detective Bingham testified regarding his expert opinion that defendant possessed the various drugs for sale. In particular, with respect to the marijuana, Detective Bingham noted the amount and packaging of marijuana (small amounts in individual baggies), the post-it note identifying marijuana types and prices, the large amount of cash, and the scales all indicated possession for sale. With respect to the pills, he noted most prescription drug abusers possess only a single type of narcotic

---

[3]     This "20.7" figure was derived by the deputy sheriff who weighed the methamphetamine seized from defendant's residence once they returned to the sheriff's office.

3

rather than, as here, at least three types (one bottle with someone else's name on it). And, with respect to the methamphetamine, he opined the significant amounts possessed by defendant, as well as the multiple scales and large amount of cash, indicated her intent to sell. According to Detective Bingham, for a typical heavy user like defendant, the amount found in the first search would suffice for 80 to 160 doses.[4] He had never heard of a user regularly ingesting one gram of methamphetamine daily; rather, he believed a heavy user would regularly use about 0.5 gram daily. Finally, Detective Bingham added that on neither occasion did defendant appear to be under the influence.

Defendant also testified in self defense, describing herself as a 67-year old, heavy user and addict of both methamphetamine and marijuana. With respect to the former, she had been an intermittent addict since age 18 and, recently, a heavy user, ingesting about a gram daily. Defendant would weigh this amount out on a scale, and then smoke or snort every hour or so throughout the day. She generally would buy methamphetamine one ounce (28.5 grams) at a time for $600 from a friend in Fresno. With respect to the marijuana, she procured it at different times from different sources, which explained the large amount found at her residence. Defendant had bought some of the marijuana years ago, and had bought some of it about a month ago, paying $500 for a half pound. All the methamphetamine and marijuana found inside her residence was for her own personal use. Defendant knew nothing about the bag of methamphetamine found in the bush outside her residence.

Defendant explained that she used a video security system for her safety because she feels vulnerable living alone. The plastic bags were for her jewelry beads and other things, not drugs. As for the $927 in cash, defendant stated that she recently cashed a $600 check from her neighbor, for whom she works as a home care provider. Defendant had also saved money to cover her $450 monthly rent and her $600-to-$700 monthly

---

[4]     Criminalist Anthony Valerio later testified that, on July 15, 2011, a total of approximately 18.67 grams of methamphetamine was seized, slightly less (2.03 grams) than the total described by Detective Bingham; and that on August 19, 2011, a total of 3.32 grams of methamphetamine was in the bag found outside in the bush, again slightly less (0.68 gram) than the total described by Detective Bingham.

4

drug habit. She earned monthly income from social security ($700), employment as a home care provider ($800 to $1,000) and, during the summer, employment from event catering (about $2,000 total monthly income).[5]

Finally, with respect to the oxycodone and hydrocodone pills, defendant explained she was safe-keeping them for her friend, Charlene McCracken, who was homeless and a frequent visitor to defendant's home. Similarly, defendant was safe-keeping the morphine pills for a friend, "Lori Davis," who had removed the label from the bottle.

In rebuttal, Detective Bingham returned to the stand and questioned defendant's testimony that she used about a gram of methamphetamine daily. Specifically, he opined this amount was simply too high based on what other addicts had told him in the past regarding their drug consumption. One woman who was a heavy user, Detective Bingham recalled, told him she smoked from 0.2 to 0.4 grams daily, and that when she once used a gram, it made her pass out for 30 minutes, kept her high for three days, and then, afterward, made her "crash" for five to eight days. Detective Bingham also opined that, if defendant had used a gram the day before their search of her residence, she would have been displaying lingering effects of the drug, which was not the case.

On November 18, 2011, a jury found defendant guilty as charged as to counts one, three and four; and guilty of the lesser included offense of simple possession of a narcotic as to count two (Health & Saf. Code, § 11350). The trial court thereafter found true the two prior conviction enhancements (Health & Saf. Code, § 11370.2, subd. (c)), and the on-bail enhancement (§ 12022.1).

At the December 19, 2011 sentencing hearing, the trial court imposed the upper three-year term on count four (possession of methamphetamine for sale); three consecutive eight-month (1/3 the middle) terms for counts one, two and three (possession for sale of methamphetamine and marijuana, and simple possession of a narcotic); two consecutive three-year terms for the prior conviction enhancements, and an additional

---

[5]     After her July arrest, defendant owed money to the friend who bailed her out of jail; however, she earned a fair amount of money working at a July fair, which allowed her to buy about a half ounce of methamphetamine around August 1, 2011.

5

two-year consecutive term for the "on-bail" enhancement. The trial court thus sentenced defendant to a total term of 13 years in jail, with an order for her release under Probation Department supervision upon service of eight years. This timely appeal followed.

## DISCUSSION

Defendant raises two issues by direct appeal and three by petition for writ of habeas corpus (writ petition). Specifically, she contends on appeal that: (1) the trial court deprived her of the constitutional right to trial by jury by failing to instruct as to her defense to count two, possession of a narcotic; and (2) defense counsel deprived her of the constitutional right to effective assistance of counsel by failing to raise certain objections during sentencing. She contends by writ petition that: (1) the prosecutor's use of false evidence deprived her of due process; and defense counsel denied her effective assistance of counsel by: (2) failing to challenge this use of false evidence, and (3) failing to adequately and accurately convey to her the terms of the prosecution's pre-trial plea offer. We address each issue below.

## I. Was it prejudicial error to fail to instruct on defendant's defense to count two?

Defendant argues the trial court violated her constitutional right to have the jury instructed on her theory of the case by failing to give an instruction on her defense to count two, possession of a narcotic.[6] Specifically, defendant's defense to this possession offense is that she "innocent[ly] possess[ed]" the pills on behalf of two friends, Charlene McCracken and Lori Davis. Defendant testified in support of this defense that McCracken had a prescription for the oxycodone pills, but nonetheless asked defendant to keep them because she was homeless and feared they would be lost or stolen. Davis, defendant explained, asked her to keep the morphine pills because Davis could not keep them safe from the children and other adults with whom she lived.

The following applicable legal principles are not in dispute. "A trial court must instruct on the *law* applicable to the facts of the case. [Citation.] In addition, a defendant

---

[6]     Recall that, on count two, the jury convicted defendant of simple possession (Health & Saf. Code, § 11350), which is the lesser included offense of the original charge, possession of narcotics for sale (Health & Saf. Code, § 11351).

6

has a right to an instruction that pinpoints the *theory* of the defense. [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 486.) However, at the same time, "courts have the duty to screen out invalid theories of conviction [or defense], either by appropriate instruction or by not presenting them to the jury in the first place." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1131.) Moreover, a "trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 39-40.) " 'It has long been the law that it is error to charge the jury on abstract principles of law not pertinent to the issues in the case. [Citation.] The reason for the rule is obvious. Such an instruction tends to confuse and mislead the jury by injecting into the case matters which the undisputed evidence shows are not involved.' [Citations.]" (*People v. Mills* (2012) 55 Cal.4th 663, 680-681.)

Applying these principles here, we conclude the trial court committed no error by failing to give defendant's proposed instruction on her "innocent possession" defense because such defense finds no basis in California law. (See *People v. Guiton, supra,* 4 Cal.4th at p. 1131.) In fact, defendant directs us to no on-point legal authority for such a defense; nor have we found any. Instead, defendant directs us to legal authority supporting a *different* defense to possession that is wholly inapplicable to her case – to wit, the defense of momentary possession of a controlled substance, which is set forth in CALCRIM 2305. As the instruction makes clear, this defense requires possession of a controlled substance by the defendant "in order to (abandon[,]/[or] dispose of[,]/[or] destroy) it." (CALCRIM 2305; see also *People v. Martin* (2001) 25 Cal.4th 1180, 1191-1192 ["conclud[ing] that the defense of transitory possession devised in *Mijares* applies only to momentary or transitory possession of contraband for the purpose of disposal, and that the trial court did not err in refusing defendant's requested instruction [that possessing illegal drugs solely for the purpose of disposal does not constitute unlawful possession]"].) Here, of course, there is no contention, much less evidence, that defendant possessed the pills for any of those reasons. A trial court has no sua sponte duty to instruct on "doctrines of law that have not been established by authority."

7

(*People v. Michaels* (2002) 28 Cal.4th 486, 529; see also *People v. Flannel* (1979) 25 Cal.3d 668, 680-683 [a trial court was not required to instruct on imperfect self-defense until that defense was recognized by California decisions].)

Finally, we decline defendant's request to craft a "judicially-created exception of lawful possession under [her circumstances] as a matter of public policy," given the lack of any worthy public policy that would in fact be served.

## II. Was defendant's constitutional right to effective assistance of counsel denied during sentencing?

Defendant contends her trial attorney's failure to object during sentencing to the trial court's imposition of the upper term on count four and consecutive terms on counts one through three denied her the constitutionally-protected right to effective assistance of counsel. Defendant reasons that the trial court relied upon unsupported or otherwise improper factors when rendering her sentence.

To prevail on a claim of ineffective assistance of counsel, the defendant must prove more than a failure by counsel to raise a particular objection. Rather, "defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "Prejudice" in this context occurs only where defense counsel's deficient performance " 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*People v. Kipp* (1998) 18 Cal.4th 349, 366, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686.) Further, if "a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient." (*People v. Kipp, supra,* 18 Cal.4th at p. 366.)

In addition, "[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.) In applying this standard, the defendant must overcome a strong presumption that

counsel's conduct was sound trial strategy or otherwise within the wide range of reasonable professional assistance. (*People v. Burnett* (1999) 71 Cal.App.4th 151, 180; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1215.)

Here, as defendant admits, a trial court's sentencing decisions are left to its sound discretion, subject to reversal on appeal only upon a showing of abuse. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847; § 1170, subd. (b).) It is within this context that we consider the prudence of defendant's trial counsel's failure to object to certain factors relied upon by the court to impose the upper term on count four and consecutive terms on counts one through three.

First and foremost, we note the absence of any explanation in the record for trial counsel's failure to object in these instances. Nor is there anything in the record indicating that her trial counsel was asked to explain his actions or omissions. As such, under the standards set forth above, we must reject defendant's claim of ineffective assistance of counsel on direct appeal " 'unless there simply could be no satisfactory explanation.' (*People v. Pope* (1979) 23 Cal.3d 412, 426.)" (*People v. Kipp, supra,* 18 Cal.4th at p. 367; *People v. Kraft, supra,* 23 Cal.4th at p. 1069.)

Having reviewed this record, we conclude a plausible tactical explanation does in fact exist for defendant's trial counsel's silence during sentencing, such that defendant's first ineffective assistance claim must fail: Counsel could have reasonably believed the trial court's sentencing decisions were within the broad scope of its discretion and, thus, that any objection would have been futile. Specifically, with respect to the decision to impose the upper term on count four, the trial court expressly relied on the following facts: (1) the manner in which the crime was carried out indicated planning, sophistication or professionalism; (2) defendant had numerous prior convictions; (3) "she has served a prior prison term, in fact, more than one;" and (4) her prior performance on parole was unsatisfactory. (Cal. Rules of Court, rule 4.421, subds. (a)(8), (b)(2), (b)(3), (b)(5).) There was evidence in the record to support each fact. For example, there was evidence that defendant had four prior convictions on three separate dates between 1988 and 1993, only two of which were used for enhancement purposes and thus could not also

9

be used to support imposition of the upper term. Defendant challenges the trial court's reliance on the remaining two prior convictions, insisting one of them was ultimately dismissed based upon her completion of a rehabilitation program. However, putting aside the legal issue of whether a dismissed conviction constitutes a prior conviction for sentencing purposes, the trial court nonetheless had discretion to consider it as reasonably related to defendant's recidivism. (*People v. Medina* (1990) 51 Cal.3d 870, 907 [evidence of dismissed charges admissible as aggravating evidence]; Cal. Rules of Court, rule 4.420, subd. (b) [court may consider "any other factor reasonably related to the sentencing decision"].)

There was also evidence to support the trial court's finding that defendant served at least one prior prison term based on her 1988 conviction for possession of methamphetamine for sale. While defendant questions whether the record supports the trial court's comment that there could be other prior prison terms, the law only requires one prior term to support the court's decision. (Cal. Rules of Court, rule 4.421, subd. (b)(3) [court may consider as an aggravating factor that "defendant has served a prior prison term"].)

We further find no error in the trial court's reliance on a notation in the probation report that defendant had two parole violations, one on July 18, 1990 and another on January 21, 1992. (§ 1170, subd. (b) [court may rely on the probation officer's report, among other things, when determining the proper prison term].) Defendant refers us to California Rules of Court, rule 4.411.5, subdivision (a)(3) to support her claim that the court could not rely on the parole violations referenced in the probation report because no supporting facts regarding the violations were included in the report. However, the cited rule requires factual support for references to "an arrest or charge not leading to a conviction or the sustaining of a petition;" it says nothing about parole violations, which, we note, appear to have been sustained and, in any event, are not actually disputed by defendant.

And finally, the trial court could reasonably have found the plethora of packaging material, security camera, $942 in cash and multiple scales indicated sophistication,

10

planning or professionalism. (*People v. Sandoval, supra,* 41 Cal.4th at p. 840 ["[a]ggravating circumstances considered by the trial court that are not set out in the rules are not subject to clear standards, and often entail a subjective assessment of the circumstances rather than a straightforward finding of facts"].) While defendant quibbles with the weight of this evidence, she does not prove any abuse of discretion by the trial court, particularly given that just one aggravating factor was required to support its imposition of the upper term. (*People v. Sandoval, supra,* 41 Cal.4th at p. 839 [only one].) It is quite likely defendant's trial counsel realized this and, thus, reasonably opted to stay silent.

We reach the same conclusion with respect to the trial court's imposition of consecutive, rather than concurrent, terms on counts one through three. The trial court relied on the following factors: (1) "the crimes and their objectives were predominantly independent of one another; and (2) "Count four occurred at a different time than the other counts," thereby indicating multiple periods of aberrant behavior. (See Cal. Rules of Court, rules 4.425(a)(1), 4.425(a)(3).) Defendant insists the court's reasoning was unsupported by the evidence. However, again, she has pointed to nothing indicating an abuse of the trial court's broad discretion. Specifically, the record demonstrates that counts one, two and three involved different types and amounts of drugs and, in the case of count two, a different purpose – to wit, 20 grams of methamphetamine for sale, 3.4 pounds of marijuana for sale, and a variety of prescription pills for personal use. As such, given the reasonable factual basis for the trial court's decision to impose consecutive terms, we conclude there is no basis for concluding that defendant's constitutional right to effective assistance of counsel was violated by her counsel's failure to object to the court's decision. (*People v. Osband* (1996) 13 Cal.4th 622, 728-729 ["Only a single aggravating factor is required to impose the upper term [citation], and the same is true of the choice to impose a consecutive sentence [citation]"].)

Finally, even if there were one or more valid objections to be made with respect to the trial court's sentencing decisions, this fact, without more, would not prove defendant's trial counsel had been *constitutionally* ineffective. As several courts have

11

recognized, given the realities of criminal trials, there are potential claims in nearly all cases that in retrospect could (and perhaps should) have been raised. (See *People v. Dunkle* (2005) 36 Cal.4th 861, 916 [noting that the range of permissible mitigating evidence admissible during sentencing is "virtually unlimited"], overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Yet, "the omission of a claim, whether tactical or inadvertent, does not of itself demonstrate ineffectiveness unless it was *objectively unreasonable*, meaning that the omitted claim was one that any reasonably competent counsel would have brought." (*In re Reno* (2012) 55 Cal.4th 428, 465.) Simply put, "competent counsel may often choose to forego even a valid objection (*People v. Riel* (2000) 22 Cal.4th 1153, 1197) and, in most cases, this choice is tactical rather than proof of incompetence. (*People v. Jackson* (1980) 28 Cal.3d 264, 292.)

Accordingly, we conclude defendant has failed to set forth sufficient evidence of professional incompetence to permit her to overcome the "strong presumption" that her counsel's conduct during the sentencing hearing was "sound trial strategy" or otherwise "within the wide range of reasonable professional assistance." (*People v. Burnett, supra,* 71 Cal.App.4th at p. 180; *People v. Bunyard, supra,* 45 Cal.3d at p. 1215.)

III.   **Was false evidence used against defendant in violation of due process, and was her attorney's failure to object a violation of the constitutional right to counsel?**

Defendant next argues she is entitled to habeas relief based on false testimony offered by prosecutorial witness, Detective Bingham. Specifically, she contends that Detective Bingham (and the prosecutor) should have known his testimony that a heavy user could not use a gram of methamphetamine daily was false "because it should be well known in the law enforcement and legal professions – especially by persons who hold themselves out as 'experts' – that the use of a gram of methamphetamine every day is common among persons addicted to the substance." Defendant thus concludes: "The evidence [from Detective Bingham] that a heavy user could not use a gram of methamphetamine a day was false, and it was material. The use of the false evidence

12

violated California law (Pen. Code, § 1473) and petitioner's right to due process of law (U.S. Const., Amends. V, XIV)." The following legal principles govern this claim.

" 'Penal Code section 1473, subdivision (b)(1), allows relief on habeas corpus where the petitioner shows "substantially material or probative" false evidence was introduced against him on the issues of guilt or punishment. We recently explained the materiality standard for false evidence as follows:  "False evidence is 'substantially material or probative' if it is 'of such significance that it may have affected the outcome,' in the sense that '*with reasonable probability* it *could have* affected the outcome . . . .' [Citation.]  In other words, false evidence passes the indicated threshold if there is a 'reasonable probability' that, had it not been introduced, the result would have been different. (*Ibid*.) The requisite 'reasonable probability,' we believe, is such as undermines the reviewing court's confidence in the outcome. [Citation.] . . . It is dependent on the totality of the relevant circumstances. [Citation.]  It is also, we believe, determined objectively. (Cf. *Strickland v. Washington* [(1984)] 466 U.S. [668,] 695 [80 L.Ed.2d 674, 698 [dealing with ineffective assistance of counsel in violation of the Sixth Amendment].)' (*In re Sassounian* [(1995)] 9 Cal.4th [535,] 546.)"  (*In re Malone* (1996) 12 Cal.4th 935, 965-966.)

Here, for reasons set forth below, we conclude defendant's false evidence claim fails because she cannot establish that Detective Bingham's expert opinions regarding the usage patterns of methamphetamine addicts he had spoken with or been told about was "objectively false," which habeas law also requires.  (*In re Richards* (2012) 55 Cal.4th 948, 963-966.)  Detective Bingham testified that, in his opinion, defendant's claim that she used a gram of methamphetamine daily did not appear accurate based on information he had received from other addicts, including one woman he recently spoke to who acknowledged being a heavy user and told him she smoked from 0.2 to 0.4 grams daily. According to Detective Bingham, this woman also told him that, when she once used a gram, it made her pass out for 30 minutes, kept her high for three days, and then,

afterward, made her "crash" for five to eight days.[7] Detective Bingham also noted that, if defendant had used a gram the day before their search of her residence, she would have been displaying lingering effects of the drug, which was not the case. Detective Bingham acknowledged, however, that he had no medical expertise or training upon which to base his opinions regarding methamphetamine consumption; rather, his opinions were based on his own professional experiences with addicts and other law enforcement officials and, in many instances, were anecdotal in nature.

Insisting Detective Bingham's testimony was not true, defendant offers the declaration of Rochelle Renee Miller, who attests that, during her arrest two weeks before trial for being under the influence of methamphetamine, she told Detective Bingham, among other things, that "she generally used a gram a day by smoking or snorting it, and that it was not at all unusual for an addict to do so," and that "injecting one gram all at once had a powerful effect, but that she had done it several times." This testimony does appear to contradict Detective Bingham's above-described testimony that he had never met an addict who regularly consumed a gram of methamphetamine daily, and that one heavy user that he recently arrested told him she used just 0.2 to 0.4 grams daily. However, on this record, we nonetheless question whether defendant could establish that Detective Bingham's testimony was actually false, as opposed to a subjective, even if mistaken, belief or recollection of past conversations. As the California Supreme Court explains: "If, and only if, a preponderance of the evidence shows that an expert opinion stated at trial was objectively untrue, the false evidence standard applies." (*In re Richards, supra*, 55 Cal.4th at pp. 963, 971 [habeas relief lies where "some piece of evidence at trial was *actually false*" and "it is reasonably probable" that, without the evidence, the verdict would have differed]; see also *In re Pratt* (1999) 69 Cal.App.4th 1294, 1314 [" 'the usual rule, that "evidence must be taken most strongly in support of

---

[7]    Specifically, Detective Bingham testified that an individual he arrested two weeks earlier for being under the influence "said that a gram of methamphetamine was the most she had ever used [at one time]" and that she "smoked anywhere from 2/10th of a gram to 4/10th of a gram per day."

14

the order appealed from and conflicts must be resolved in favor of respondent,'" is applicable on habeas corpus review' "].)

Moreover, while defendant also relies on other newly-offered evidence to prove the falsity of the detective's testimony, this evidence likewise fails to provide a basis for habeas relief. For example, defendant offers the declaration of expert Halle Weingarten, who, in defendant's words, opined based on "[her] experience and knowledge of the pharmaceutical literature, [that] it is common for heavy users to use a gram or more of methamphetamine every day, because of the 'tolerance' they have built up for it." However, as the California Supreme Court explained under comparable circumstances, "when new expert opinion testimony is offered that criticizes or casts doubt on opinion testimony given at trial, one has not necessarily established that the opinion at trial was *false*. Rather, in that situation one has merely demonstrated the subjective component of expert opinion testimony." (*In re Richards, supra,* 55 Cal.4th at p. 963.)

Next, defendant offers "at least 11 cases which have resulted in appellate decisions during the last 10 years" that, she claims, involved expert testimony that "heavy users of methamphetamine use 1 gram or more per day." According to defendant, most of these experts in other cases were police officers, including a Lake County Sheriff's Detective who testified in a case for the same prosecutor involved in this case (suggesting the prosecutor knew or should have known Detective Bingham's testimony in this case was false). However, as we just finished explaining, contrary expert opinions may cast doubt on Detective Bingham's testimony, but do not necessarily prove that his testimony was objectively false. (*In re Richards, supra,* 55 Cal.4th at p. 963.) Moreover, there is a more basic problem with defendant's evidence. These prior appellate decisions, some dating back several years or more, were readily available at the time of trial and, thus, cannot be relied upon for the first time on habeas corpus. (*In re Seaton* (2004) 34 Cal.4th 193, 200 ["just as a defendant generally may not raise *on appeal* a claim not raised at trial . . . , a defendant should not be allowed to raise on *habeas corpus* an issue that could have been presented at trial," for otherwise, "the main purpose of the forfeiture rule—to

15

encourage prompt correction of trial errors and thereby avoid unnecessary retrials—would be defeated."].)[8]

Of course, defendant may still raise as grounds for habeas relief the issue of ineffectiveness of counsel based on her trial attorney's failure to object to the accuracy of Detective Bingham's opinions. (*In re Seaton, supra,* 34 Cal.4th at p. 200; see also *In re Harris, supra,* 5 Cal.4th at p. 834, fn. 8 [where petitioner's habeas claim depends on facts that could have been, but were not, placed on the record below, the claim is generally limited to ineffective assistance of counsel].) However, the burden of proving error on this ground is indeed quite high, as we have already explained. (Pp. 8-9, *ante*.) And, here, defendant has not met this burden with respect to counsel's failure to object to the credibility or accuracy of Detective Bingham's testimony.

In fact, the record reflects defendant's trial counsel did challenge Detective Bingham's testimony regarding the typical consumption patterns of heavy methamphetamine users, albeit in a different manner than defendant now proposes. Specifically, defense counsel directly challenged Detective Bingham's testimony in closing arguments, not by accusing him of perjury, but by attacking the weight of his testimony based on his limited experience with and knowledge of methamphetamine use and users:

"Ms. Adams has testified that she's a heavy consumer of meth, that she's consumed – she consumes probably approximately one gram of meth a day. Now, Detective Bingham testified that he thought that amount of methamphetamine seemed to be a bit much. He testified that he never had come across anybody who used that much methamphetamine. But he also testified that meth users who have been using for a long time will often gain the ability to consume greater amounts of methamphetamine, and my client testified essentially that she  -- she's a meth user since she was 18 years old. Now, she's 67 now.

---

[8]    Defendant's request for judicial notice of "evidence of the record" in ten nonpublished California appellate decisions, all of which predate these proceedings, is denied. (See *People v. Ruiz* (1964) 228 Cal.App.2d 703, 707 [denying motion to produce additional evidence on appeal where "defendant has not demonstrated that this purported evidence was unavailable at the time of trial"].)

16

So that's 50 years, essentially, that she has been a meth user. For that length of time it's possible that she had obtained the ability to consume larger and larger amounts of methamphetamine.

"Now, Mr. Bingham, I'm guessing never came across an individual who had been consuming methamphetamine for 50 years. So he never testified that he had ever come across a 67-year-old woman who had been consuming methamphetamine for that length of time, so he's never come across someone who could have possibly built up that amount of tolerance for the methamphetamine. [¶] So just because Detective Bingham hasn't run across a situation where a meth user could use a gram of meth a day doesn't mean it's not possible.

"He also testified that different users have different reactions to methamphetamine. Detective Bingham is not – as he testified he's not a medical expert, he's not a doctor, he doesn't treat meth addicts, he only – his information of what meth users do comes from the users themselves. So he doesn't actually see them consume this methamphetamine, he relies upon what these meth users tell them about what they consumer. [¶] Obviously, if you're a law enforcement officer and you're talking to someone who is a meth user there's some possibility that that meth user talking to that law enforcement officer might not always be honest with what they're telling him. So his reliance upon his statement of these other meth users that he's relying upon might not be 100 percent accurate."

Defendant now claims her trial counsel's closing argument was "mild as milk toast" because the detective's testimony could have been proved false "directly by Rochelle Miller's testimony" or "indirectly by producing the testimony of well-qualified experts about tolerance and what is known in the scientific community about the amount of methamphetamine that addicts with a high tolerance can and do consume." However, even if defendant is correct that another defense strategy would have been more effective, this fact does not prove counsel's performance constitutionally infirm. (*Strickland v. Washington, supra*, 466 U.S. at p. 686 [to prove a violation of the constitutional right to effective assistance of counsel, defendant must show "his counsel's performance was deficient when measured against the standard of a reasonably competent attorney"].)

17

Because defendant's trial counsel did in fact challenge the accuracy of Detective Bingham's opinions with respect to typical addicts' daily methamphetamine intake, we cannot conclude his performance was so deficient that it "resulted in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.]" (*People v. Kipp, supra,* 18 Cal.4th at p. 366.)

We further point out that defendant could have offered, but did not, a declaration by her trial counsel identifying why he chose to challenge Detective Bingham's testimony in closing arguments rather than by calling an expert witness or another witness (like Miller) to contradict him. In the absence of such proof we decline to speculate that counsel's actions or omissions were due to incompetence rather than reasonable trial strategy (particularly in the case of Miller, who counsel may have reasonably declined to call as a witness based on her admitted long-term heavy drug use and state of intoxication while talking to Detective Bingham). As such, another ground exists for rejecting defendant's second ineffectiveness-assistance claim: "If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People v. Kipp, supra,* 18 Cal.4th at p. 367.) And, finally, we add that, even assuming for sake of argument, defendant's counsel was constitutionally deficient, we would nonetheless conclude no harm was done given the strength of the evidence of her possession for sale. To name but some of this particularly strong evidence, defendant was found in possession of large quantities of cash and narcotics, tools and packaging, including multiple scales and small baggies, commonly used in illicit drug sales, and a home video security system to monitor activity around her residence. Accordingly, her ineffective assistance of counsel challenge fails on multiple grounds. (*People v. Kipp, supra,* 18 Cal.4th at p. 366.)

**IV.** **Was defendant's constitutional right to effective assistance of counsel denied during plea bargaining?**

Defendant's final claim is that her right to effective assistance of counsel was denied by her trial attorney's failure to accurately convey to her the terms of a plea bargain offered by the prosecution prior to trial in exchange for a guilty plea. This bargain, which defendant claims she would have accepted if accurately conveyed, was in her own words as follows: "[P]rior to trial, she was offered under 're-alignment' a 6-year term in the county jail, consisting of 3 years of actual jail custody and 3 years of community supervision. . . . With 1 day of conduct credit for each day of actual custody, the 3 years would be reduced to 1 ½ years and would be further reduced by the number of days of credit which she had already earned – probably resulting in her being incarcerated for about 10 months." To support her argument, defendant offers a declaration in which she attests that defense counsel told her the offer was for six years and four months, but failed to explain there was a three-year community-supervision component of the term. As such, defendant attests that she mistakenly believed she would be required to serve six years and four months of actual custody reduced to three years with half-time credits, rather than three years of actual custody reduced to ten months with half-time credits.

Aside from her declaration, defendant identifies but a single page of the record that refers to a pretrial plea offer.[9] This portion of the record, which is from her post-trial sentencing hearing, states in fuller context as follows:

"[PROSECUTOR]: Your Honor, I would submit it. I ask the Court to follow the recommendation in terms of the no probation, the upper term, the special allegations and I believe the total would be 13 years.

"[COURT]: [Probation] also recommend a split sentence here. So after the final five years – to be released after eight years. The final five years to be served under community supervision of the probation department.

---

[9] Defendant also refers to the court minutes from an October 31, 2011 trial readiness conference but, as the prosecution notes, there is no reference in those minutes to any plea bargain. Moreover, neither party has provided a transcript from any hearing at which the alleged plea bargain was made or discussed.

"[PROSECUTOR]: Well, I don't necessarily agree with that because it says to be released – this is on page 16 – to be released after serving eight years, which in actuality would be – with credits would be four years. And ─

"[COURT]: Yeah, that's what it means.

"[PROSECUTOR]: I think that the big problem here is that if she's on community supervision in her home, that she was basically dealing drugs out of her home. . . . [¶] But if she's – if she's out in her home after four years I don't thing that that's going to be sufficient to – to prevent her from going back to dealing drugs,

"[COURT]: In your opinion should any portion of it be released with a split sentence?

"[PROSECUTOR]: Perhaps a smaller portion.

"[COURT]: Otherwise, I'm sentencing her to county jail for 13 years.

"[PROSECUTOR]: Yes, it seems very strange but that's the law that we have.

"[COURT]: It is.

"[PROSECUTOR]: But I think at least – at the very least she should serve six years.

"[COURT]: Actual time. We're talking about a 12-year county jail sentence with one year suspended?

"[PROSECUTOR]: Six – yeah, six years actual time, yes. *I mean she was made an offer before she took it to trial. I think the offer at that point was six years total and she* ─ [Italics added.]

"[COURT]: *And do three*? [Italics added.]

"[PROSECUTOR]: *To do three with credits, yeah.* [Italics added.] And she was well aware of her two priors that would add on three years plus. She was on bail at the time, that aggravates it, and she refused to take the offer."

As the prosecution notes, this colloquy does not describe the plea bargain in the manner alleged by defendant. Specifically, neither the prosecutor nor the court mentions a community-supervision component of the plea bargain that would reduce a six-year custody requirement to three years under community supervision and only ten months of actual time in custody. Rather, they mention only "credits" as a factor reducing a six-year sentence to three years of actual time. Specifically, the prosecutor quite clearly

20

explained: "[T]he offer at that point was six years total and she . . . [¶] To do three with credits, yeah." Defendant offers no declaration or other evidence from individuals involved in the purported plea negotiations (including from her own attorney) to support her contrary version of events, despite her burden to do so.[10] (*People v. Duvall* (1995) 9 Cal.4th 464, 474 ["To satisfy the initial burden of pleading adequate grounds for relief, an application for habeas corpus must be made by petition" that "(i) state[s] fully and with particularity the facts on which relief is sought [citations], as well as (ii) *include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations,*" italics added]; see also *In re Clark* (1993) 5 Cal.4th 750, 781, fn. 16 [same].)

Given this limited record, we agree with the prosecution that defendant has not made the requisite showing to warrant issuance of an order to show cause. It is well-established that the "petitioner in a habeas corpus proceeding has the burden not only of alleging but also proving the facts on which he relies in support of his claim for relief." (*In re Lawler* (1979) 23 Cal.3d 190, 195.) " 'If a criminal defendant has unsuccessfully tested the state's evidence at trial and appeal and wishes to mount a further, collateral attack, " ' "all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the burden of overturning them. Society's interest in the finality of criminal proceedings so demands, and due process is not thereby offended.' " ' [Citation.]" (*In re Reno, supra,* 55 Cal.4th at p. 451.)

Here, defendant has not complied with these rules. As the California Supreme Court has aptly stated: "Conclusory allegations made without any explanation of the

---

[10]     In fact, we conclude the prosecution has provided the more reasonable version of events: "[I]n context, petitioner's interpretation of the prosecutor's statement makes no sense. The prosecutor was arguing that eight years was not a long enough sentence. She argued that eight years, reduced by half by conduct credits to four years, is not significantly different from six years, reduced by half by credits to three years, because four years of custody is not that much greater than three years of custody. On petitioner's interpretation, the plea bargain offer was for only 10 months in custody. But it would have made no sense for the prosecutor to argue that four years in custody is not a significantly greater sentence than *10 months in custody*."

basis for the allegations do not warrant relief, let alone an evidentiary hearing." (*People v. Duvall, supra*, 9 Cal.4th at p. 474.) Accordingly, we decline to issue an order to show cause on defendant's petition for habeas relief.

## DISPOSITION

The judgment is affirmed. No order to show cause shall issue.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Pollak, J.